P. Matthew Muir (USB No. 9560)
JONES WALDO HOLBROOK & MCDONOUGH, P.C.
170 S. Main, Suite 1500
Salt Lake City, UT 84101
Telephone: 801-521-3200
Fax: 801-328-0537
mmuir@joneswaldo.com

Robert B. Weiser (subject to admission pro hac vice)
James M. Ficaro (subject to admission pro hac vice)
THE WEISER LAW FIRM, P.C.
Four Tower Bridge
200 Barr Harbor Dr., Suite 400
West Conshohocken, PA 19428
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
rw@weiserlawfirm.com
jmf@weiserlawfirm.com

Peretz Bronstein (subject to admission pro hac vice)
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 E 42nd Street, Suite 4600
New York, New York 10165
Telephone: (917) 697-8209
peretz@bgandg.com

## UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| JASON REAGAN, Derivatively on behalf of CO-DIAGNOSTICS, INC.<br><br>Plaintiff,<br><br><br>v.<br>DWIGHT H. EGAN, EUGENE DURENARD, EDWARD L. MURPHY, JAMES B. NELSON, BRENT SATTERFIELD, and RICHARD S. SERBIN<br><br>Defendants, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and JURY DEMAND**<br><br><br>Case No. 2:21-cv-00054-DBB<br><br>Judge David Barlow |

|  |  |
|---|---|
| and<br><br>CO-DIAGNOSTICS, INC.<br><br>                        Nominal Defendant |  |

Plaintiff Jason Reagan ("Plaintiff"), by and through his undersigned counsel, respectfully submits this Verified Stockholder Derivative Complaint on behalf of nominal defendant Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company") against certain of its directors and officers named herein (the "Individual Defendants" as defined below). Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including, among other things, review and analysis of: (a) public filings made by Co-Diagnostics with the U.S. Securities and Exchange Commission (the "SEC"); (b) press releases, postings on Co-Diagnostics' website and other publications caused or allowed to be disseminated by the Company; (c) news articles, analyst reports and other public documents; and (d) public filings in related litigation.

1.      This is a shareholder derivative action brought on behalf of Co-Diagnostics against the Company's directors and officers. The Individual Defendants breached their fiduciary duties to Co-Diagnostics by issuing false and misleading statements about the accuracy of the Company's main product: a COVID-19 diagnostic test. As a result of these statements touting the accuracy of the test, the Company's stock price skyrocketed, and certain of the Individual Defendants used this opportunity to liquidate their personal stockholdings and reaping large profits before their deception was uncovered.

2.      In early 2020, drug companies were racing to create an accurate diagnostic test for COVID-19 that had quick response times. Co-Diagnostics seemingly won that race. Co-

Diagnostics announced that it had received regulatory clearance to sell its tests in the European Community on February 24, 2020—the first company in the world to receive this clearance. Then, on April 6, 2020, the Company announced that it had received emergency use authorization for its tests from the U.S. Food and Drug Administration ("FDA").

3.      Throughout this time and thereafter, the Individual Defendants made unequivocal statements to the market that the Company's COVID -19 tests were 100% accurate—a staggering claim that appeared to set Co-Diagnostics apart from other competitors. In truth, Co-Diagnostics' COVID-19 tests are materially less than 100% accurate – a material discrepancy.

4.      Nonetheless, Co-Diagnostics' market-first test, together with its claims that its tests were perfectly accurate, allowed Co-Diagnostics to sign lucrative contracts with state governments in the U.S. and governments around the world.

5.      As a result of this misrepresentation and the influx of taxpayer dollars to Co-Diagnostics, the Company's stock – which had recently faced delisting – soared.

6.      The crash came when the Individual Defendants began acting evasively about its COVID-19 tests' true accuracy and regulatory authorities contradicted claims made by Co-Diagnostics about the accuracy of the Company's diagnostic tests.

7.      Prior to the Company's May 14, 2020 first quarter financial results, news outlets reported that Co-Diagnostics was reticent to participate in U.S.-based testing to verify its accuracy claims.

8.      As public reports casting doubt on Co-Diagnostics claims of 100% accuracy began to circulate, the stock declined rapidly on May 14, 2020 from its high of $29.52 per share to an intra-day low of $18.35 before closing at $22.13. The losses on May 14, 2020 were so sudden that the stock stopped trading at periods during the day.

9.      After markets closed and with this information in hand, Co-Diagnostics issued an earnings report for the first quarter of 2020 and held a call that commented on the Company's future prospects. On the call, the Company's Chief Executive Officer ("CEO") Dwight Egan ("Egan") offered a glowing report explaining that the Company had sold 6 million tests and had already purchased components to manufacture an additional 20 million tests that were already ordered by customers.

10.     On the call, neither Egan nor the Company's Chief Financial Officer ("CFO"), Reed Benson ("Benson"), mentioned the public statements made by third parties relating to the tests' accuracy. Notably, Chief Science Officer, and inventor of Co-Diagnostics' technology, Brent Satterfield ("Satterfield"), was absent from the call and did not address the allegations after boasting to the market about Co-Diagnostics' COVID-19 testing accuracy in press releases in the weeks leading to the Company's earnings announcement.

11.     That evening, in response to other drug companies' widely-reported test accuracy struggles, financial news services began reporting that the FDA announced publicly that no COVID-19 test is 100% accurate – publicly undermining the Individual Defendants' claims about Co-Diagnostic's tests' perfect accuracy.

12.     When markets opened on May 15, 2020, the stock slid to $15.80 per share.

13.     During this time, and with a cloud of doubt hanging over the Company's claims of accuracy, Co-Diagnostics' directors and officers sold their personally held Company stock for material profits.  For example, on May 23, 2020, Defendant Eugene Durenard ("Durenard") sold a total of 100,000 shares of Co-Diagnostics common stock for proceeds of over $1.8 million.  The next day, Defendant Richard A. Serbin ("Serbin") sold 50,000 share of Co-Diagnostics common stock for proceed for $913,025. The Individual Defendants, knowing the truth of the company's

4

products and its future prospects, are taking their profits at cost to the public markets before the truth ultimately emerged.

14.     As a result of this alleged misconduct, Plaintiff served a pre-suit shareholder demand pursuant to Utah Code § 16-10a-740 on the Co-Diagnostics Board of Directors (the "Board") on November 11, 2020 (the "Demand").  A true and correct copy of the Demand and evidence of its delivery is attached hereto as Exhibit A.

15.     On November 24, 2020, a related shareholder derivative action, captioned *Wallace v. Egan*, et al., Case No. 20-cv-00836 was filed in this Court (the "*Wallace* Action").  Therein, a shareholder of Co-Diagnostics similarly served a pre-suit demand and received correspondence from counsel for the Company stating that the Board would not conduct an investigation into the allegations in the demand.

16.     Thereafter, on December 4, 2020, in order to ensure receipt of the Demand, Plaintiff's counsel sent the Demand via email to the counsel for the Company identified in the *Wallace* Action.  To date, there has been no response.  A true and correct copy of the December 4, 2020 correspondence is attached hereto as Exhibit B.

17.     It is clear both from the statements made by counsel excerpted in the *Wallace* Action and from the Board's failure to respond to the Demand, that the Board does not intend to conduct a meaningful investigation into the allegations in the Demand in violation of Utah law.

18.     Accordingly, the Company has been damaged.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the

state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

20.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

21.     Plaintiff is a shareholder of Co-Diagnostics and has continuously held Co-Diagnostics common stock since March 2020. Plaintiff is a citizen of California.

22.     Nominal Defendant Co-Diagnostics is a Utah Corporation with its headquarters in in Salt Lake City, Utah. Co-Diagnostics is a citizen of Utah.

23.     Defendant Egan has served as a director of the Company since 2013. Egan currently serves as the Company's Chief Executive Officer and Chairman of the Board. Defendant Egan is a citizen of Utah.

24.     Defendant Durenard has served as a Company director since 2019. Defendant Durenard is a citizen of New York.

25.     Defendant Edward L. Murphy ("Murphy") has served as a Company director since 2019. Defendant Murphy is a citizen of Ontario, Canada.

26.     Defendant Serbin has served as a Company director since 2017. Defendant Serbin is a citizen of New York.

27.     Defendant Satterfield has served as the Company's Chief Science Officer since April 2013. Defendant Satterfield is a citizen of Utah.

28.     Defendant James Nelson ("Nelson") has served as a Company director since 2019. Defendant Nelson is a citizen of Utah.

## DEFENDANTS' DUTIES

29.     By reason of their positions as officers, directors, and/or fiduciaries of Co-Diagnostics and because of their ability to control the business and corporate affairs of Co-Diagnostics, Defendants owed Co-Diagnostics and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Co-Diagnostics in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Co-Diagnostics and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Co-Diagnostics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     Defendants, because of their positions of control and authority as directors and/or officers of Co-Diagnostics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Co-Diagnostics, each of the Defendants had knowledge of material non-public information regarding the Company.

31.     To discharge their duties, the officers and directors of Co-Diagnostics were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Co-

Diagnostics were required to, among other things:

      a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

      c.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

32.     Co-Diagnostics, Inc. was formed on April 18, 2013, as a Utah corporation. The Company went public in 2017.

33.     Co-Diagnostics' primary source of revenue was from selling diagnostics tests for Zika Virus, Tuberculosis, Hepatitis B, Hepatitis C, Malaria, Dengue Fever, and HIV. Its customers were primarily located in the Caribbean, in Central and South America, in North America, and in India.

34.     The Company forecasted that it would be authorized to sell Tuberculosis, Hepatitis B, and Hepatitis C tests in the European Union in 2018 and 2019.

35.     The Company's initial filings with the SEC admit that beyond 2019, Co-Diagnostics did not have a plan for further research and development or any target diseases that it

was aiming to create diagnostic tests for, but anticipated selling tests "based on need and regulatory barriers" in the United States.

36.     According to Co-Diagnostics, it began developing COVID-19 tests rapidly using a technology called CoPrimer, which was developed and patented by Satterfield before the outbreak. Based on public reports, Co-Diagnostics used the CoPrimer technology to develop a COVID-19 diagnostic test within one week.

37.     CoPrimer allegedly worked so well that Co-Diagnostics, despite its relatively small size, became the first company in the world to obtain the prestigious CE marking for its COVID-19 tests. The CE certification mark indicates conformity with health, safety, and environmental protection standards for products sold within the European Economic Area.

38.     Co-Diagnostics announced on February 24, 2020, that it had received regulatory approval to sell in the European Community. It was the first U.S. company to receive approval for the export to Europe of COVID-19 test kits.

39.     Co-Diagnostics' stock began to rise on the news. The stock traded at over $15 per share at the end of February 2020, and at over $17 per share in early March 2020.

40.     On April 6, 2020, Co-Diagnostics became the first company to receive approval from the U.S. FDA for its COVID-19 tests under an Emergency Use Authorization, which permitted Co-Diagnostics' tests to be used by certified clinical laboratories in the U.S. for the diagnosis of COVID-19.

41.     The stock, which in the weeks after the CE announcement had settled to $8 per share, began to climb again.

42.     Co-Diagnostics rushed its product to market because it had many larger competitors who were also hurrying to get an accurate diagnostic test to market.

43.     After Co-Diagnostics obtained its certifications, it began selling millions of dollars' worth of COVID-19 tests to 50 countries and more than 12 states in the U.S. The stock continued to climb.

44.     During this time Co-Diagnostics was able to obtain lucrative contracts to provide testing to states and foreign countries. For example, Co-Diagnostics was going to provide the majority of the tests for a $5 million contract with the state of Utah that ran from March 31, 2020 through May 30, 2020. Co-Diagnostics was also to provide tests for a contract with Iowa totaling $26 million for approximately 540,000 testing kits.

45.     Not all news was good, however. On April 30, 2020, The Salt Lake Tribune published an article titled "'This is a Potential Public Health Disaster': COVID-19 results from TestUtah.com are raising questions." The article questioned the accuracy of Co-Diagnostics tests being used at sites run by TestUtah.com.

46.     Satterfield was quoted in the article, reassuring the public that the alleged inaccuracies were due to "population differences."  The article stated:

> But Satterfield maintained that in a real-world environment, people who have contracted COVID-19 have thousands or even hundreds of thousands of particles of the virus in their samples, and that's plenty to trigger a positive in his company's tests.
>
> He added that Co-Diagnostics' COVID-19 tests scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe. He said those evaluations often put his kits side by side against other available kits to gain consensus results.

47.     On May 1, 2020, to allay public health and investor concerns, Co-Diagnostics issued a press release titled: "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations." The press release unequivocally stated that Co-Diagnostics COVID-19 tests were 100% accurate based on data gathered from across the world:

Co-Diagnostics, Inc. (Nasdaq:CODX) (the Company), a molecular diagnostics company with a unique, patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to determine accuracy in molecular diagnostics testing.

The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations were conducted in Mexico by the Mexican Department of Epidemiology ("InDRE"), India, and elsewhere in the US and abroad. Each study concluded 100% concordance for both specificity and sensitivity.

48.     In the press release, Satterfield did not mention that the tests might be less than 100% accurate — abandoning his recognition that the tests were between 99.52% and 100% accurate. Instead, Satterfield insisted that Co-Diagnostics' tests were 100% accurate based on the experimental data.

49.     In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Satterfield said:

"In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, *we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that.*"

(emphasis added).

50.     While in most situations, 99.5% accuracy and 100% accuracy are functionally equivalent, in diagnostic testing of diseases with a low population saturation, the difference can dramatically affect whether a test has any value to public health officials.

51.     In practice, Co-Diagnostics results seemed to be even worse than these result rates would suggest. For example, the April 30th *Tribune* article reported that Co-Diagnostics tests being used by TestUtah.com resulted in only a 1% to 2% positive test rate even in symptomatic

11

patients, suggesting that Co-Diagnostics tests were only accurately reporting half of the COVID-19 infections, suggesting an accuracy rate even worse than the 99.5% that Co-Diagnostics initially claimed and infinitely worse than the 100% accuracy rate Co-Diagnostics began to tout in early May 2020.

52.     The market, however, accepted the Individual Defendants' false claims of 100% accuracy -- resulting in a boon to the company's share price. For example, the following publications repeated the Individual Defendants' claims, amplifying their effect on the market:

- "Co-Diagnostics (CODX) said Friday its coronavirus test has proven 100% accurate in field testing — leading CODX stock to rocket." Allison Gatlin, *Investor's Business Daily*, "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate."

- "Co-Diagnostics says coronavirus test shows spotless sensitivity data in independent evaluations" *Proactiveinvestors.com*

- "Co-Diagnostics Is a Smart Way to Play Coronavirus Testing: The company's tests are reportedly 100% accurate in at least three countries" Louis Navellier, *Investorplace.com*

53.     The Individual Defendants did not release any clarifying statements about the accuracy of the Company's test.  Co-Diagnostics' stock continued to rise in May, as investors anticipated an earnings announcement and financial report for the first quarter of 2020 on May 14, 2020 after markets closed.

54.     Co-Diagnostics' plan to repress negative reports about its tests seemed to work. On May 14, 2020, the stock reached a then all-time high of $29.72 per share.

**THE TRUTH EMERGES**

55.     However, around that same time, Co-Diagnostics' claims of test accuracy became unsustainable.

56.     In the late morning and early afternoon of May 14, 2020, third parties revealed startling information about Co-Diagnostics' allegedly 100% accurate test.

57.     *The Salt Lake Tribune* reported that TestUtah.com, which used tests developed by Co-Diagnostics, "declined to join other major Utah labs in a joint experiment to confirm one another's quality." Moreover, *The Salt Lake Tribune* revealed that TestUtah's tests [by Co-Diagnostics] "have a higher 'limit of detection' — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury." This meant that Co-Diagnostics tests were likely to have a much higher false negative reporting rate, meaning that potentially thousands of infected people were inaccurately told that they did not have the disease, an observation that was consistent with earlier concerns about TestUtah's lower rate of positive test results. *The Salt Lake Tribune*e article also expressed concern relating to TestNebraska.com and TestIowa.com, testing services that also used Co-Diagnostics tests.

58.     Also on May 14th, Iowa Governor Kim Reynolds issued a public statement saying, "I'm pleased to announce that the State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives." These results did not comport with statements previously made by the Individual Defendants on May 1, 2020.

59.     In fact, Satterfield himself has recently confessed that the lower positive rates for Co-Diagnostic's tests "has certainly got all of us scratching our heads a bit," and that the tests will correctly identify 95% of true positive results—a massive discrepancy from the Individual Defendants' representations of 100% accuracy given that the tests are intended to be administered among hundreds of thousands or even millions of people.

60.     Based on the release of third party information casting serious doubt as to the Individual Defendants' bold claims of 100% accuracy, the stock price began to fall, closing the day at $22.13 after hitting an intra-day low of $18.35, a greater than 38% decrease in price within hours.

61.     At that point, the Individual Defendants could have, but did not, revise their claims of 100% test accuracy, given that Co-Diagnostics released earnings and first quarter 2020 financials to the public after hours and had a scheduled investor call for the same evening.

62.     The Individual Defendants did report that the Company achieved record sales and that the start-up had finally, after nearly 7 years, reached profitability; however, it did not address the testing accuracy or sensitivity allegations or correct Satterfield's prior statements about tests being 100% accurate.

63.     Rather, the call was described by *The Gazette*, a Cedar Rapids, Iowa publication covering TestIowa.com as sounding "more like Thanksgiving with drunk uncles — dogs were barking, people were swearing, and someone was moaning." *The Gazette* also noted that "[n]one of Co-Diagnostics or Nomi Health's news releases about the Logix Smart tests have revealed how many tests have been sold, for how much, and so far all three testing initiatives in Iowa, Nebraska and Utah have been secretive about the tests and the results."

64.     The same day, the United States FDA issued a press release about testing accuracy. Another, much larger drug company had created a diagnostic test for COVID-19 that was under increasing public scrutiny for apparent inaccuracy. The FDA announced to the public that:

> "[t]he FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test. ***No diagnostic test will be 100% accurate*** due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly."

(emphasis added).

65.     Based on the multiple third-party sources revealing serious problems that were known, or should have been known, in advance of May 14, 2020, the stock price further fell to just over $15 per share when markets opened on May 15, 2020.

66.     By May 20, 2020, a statistician, Zhiyuan Sun, wrote an article specifically about Co-Diagnostics' allegedly 100% accurate COVID-19 test. Sun explained:

> In May, Co-Diagnostics announced its COVID-19 in vitro test had been found to have 100% accuracy, 100% specificity (likelihood of preventing a false-negative error), and 100% sensitivity (likelihood of preventing a false-positive error), as per independent verification in laboratories across the world
>
> **The devil is in the details**
>
> To start off, Co-Diagnostics came to the conclusion that its test was 100% effective on all three diagnostic dimensions (specificity, accuracy, and sensitivity) based on studies with small sample sizes. For example, laboratory testing of the Logix test kit conducted in Australia involved about 100 COVID-19-positive patients and 100 COVID-19-negative patients. With a sample size that small, a low error rate, say 1% to 2%, could be really hard to detect. In fact, the study itself explicitly stated that the test could in fact be between 96% to 98% effective, rather than 100%.
> In addition, the testing environment is by no means indicative of the actual prevalence of COVID-19 in the population at this point in the pandemic. Among the test samples, 50% contained SARS-CoV-2, and obviously, at this point, nowhere near half the people in the world have been exposed to the coronavirus. "But wait a minute!" the intelligent reader might say. "Nothing in the world is perfect, so who cares if a test's results are off by 1% or 3%? Effectiveness of 97% is still nothing short of an A-plus. You're just being a devil's advocate, Zhiyuan!" Unfortunately, this is one of the cases where it is critical to pay attention to the devil in the details. In fact, a 1% or 3% error rate can render a in vitro test almost useless. Here's why.
>
> Let us assume, for the sake of argument, the true sensitivity of Logix is 98%, and its true specificity is also 98%. In other words, the probability of the test delivering a false positive is 2%, and the probability of the test returning a false negative is also 2%. Both of these values are directly stated as being probable in studies citing Logix's range of effectiveness, and they are valid assumptions given that the test has not been fully vetted by the FDA or other regulators. It is also common knowledge that because there are not enough viral tests for the COVID-19, the

number of people who have the virus is likely to be significantly higher than official figures. For example, it is estimated that up to 4.1% of the residents of Los Angeles County have COVID-19 antibodies. Let's use that 4.1% figure in our calculations as a measure of prevalence of COVID-19 (a lower prevalence would hurt the test even more). Assuming 1 million people are given the Logix test, 41,000 should test positive for an ongoing SARS-CoV-2 infection. However, if the test provides a false negative 2% of the time, only 98% of those 41,000 -- 40,180 -- would show up as positives.

On the other hand, out of the 959,000 people who were actually negative for the virus, a 2% error rate would yield 19,180 cases of false positives -- individuals who don't have the disease despite the test saying they do. All told, that makes 59,360 people getting positive results, but only 40,180 of them would actually be positive. That yields a predictive value of 67.7%. In other words, if the Logix test only works as well as it does in this scenario -- and it's right 98% of the time -- there's still a **1-in-3** chance that the test will indicate you have COVID-19 even though you don't! As one can see, a 32.3% false-positive error rate isn't very good at all. This problem gets worse if we assume the same prevalence, but lower Logix's potential sensitivity and specificity estimates to 95% for both. In this scenario, the probability of getting a false positive increases to 55.2%! While the results are surprising, they nonetheless use the basics of conditional probability; here is a calculator in case you want to try it out for yourself. Furthermore, a recent New York University study on COVID-19 in vitro tests developed by Abbott Laboratories (NYSE:ABT) found them to be widely inaccurate and unacceptable for use in patients. Keep in mind, those tests were also promoted as having 100% sensitivity and 99.9% specificity in earlier investigations. Unfortunately, this just serves to highlight how difficult it is to develop an accurate test for diseases with a low rate of prevalence like COVID-19.

67.    The Individual Defendants knew that even a highly accurate test was not the same, and not remotely as valuable, as a 100% accurate test. That is because having a 100% accurate test would have significantly distinguished Co-Diagnostics from other larger, more reputable competitors introducing COVID-19 tests into the marketplace. The widespread administration of a COVID-19 test that is even minimally inaccurate can have highly adverse public health consequences.

**COMPANY INSIDERS ILLICITYLY LIQUIDATE THEIR SHARES**

68.     While in possession of materially adverse inside information and while the Company's stock was trading at artificially inflated prices, Durenard and Serbin liquidated their personally held Co-Diagnostics stock.

69.     On May 23, 2020, Durenard sold a total of 100,000 shares of Co-Diagnostics common stock for proceeds of over $1.8 million.

70.     On May 24, 2020, Serbin sold 50,000 share of Co-Diagnostics common stock for proceed of $913,025.

71.     These transactions occurred when both Durenard and Serbin knew that the public statements made about the accuracy of the Company's test were false and misleading.

**DERIVATIVE ALLEGATIONS**

72.     Plaintiff brings this action derivatively in the right and for the benefit of Co-Diagnostics to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

73.     Plaintiff will adequately and fairly represent the interests of Co-Diagnostics and its shareholders in enforcing and prosecuting its rights.

74.     As a result of this alleged misconduct, Plaintiff issued the Demand pursuant to Utah Code § 16-10a-740 on November 11, 2020.  A true and correct copy of the Demand is attached hereto as Exhibit A.

75.     On November 24, 2020, a related shareholder derivative action, the *Wallace* Action was filed in this Court.  Therein, a shareholder of Co-Diagnostics similarly served a pre-suit demand and received correspondence from counsel for the Company stating that the Board would not conduct an investigation.

76.     Thereafter, on December 4, 2020, in order to ensure receipt of the Demand, Plaintiff's counsel sent the Demand via email to the counsel for the Company identified in the *Wallace* Action.  To date, there has been no response. A true and correct copy of the December 4, 2020 correspondence is attached hereto as Exhibit B.

77.     It is clear both from the statements made by Board counsel excerpted in the *Wallace* Action and from the Board's failure to respond to the Demand, that the Board does not intend to conduct a meaningful investigation into the allegations in the Demand.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

78.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

79.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Co-Diagnostics disseminated accurate, truthful and complete information to its shareholders.

80.     The Individual Defendants violated their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Co-Diagnostics shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

81.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

82.     Plaintiff, on behalf of Co-Diagnostics, has no adequate remedy at law.

**COUNT II**

**AGAINST SERBIN AND DURENARD FOR INSIDER TRADING**

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     At the time Defendants Serbin and Durenard sold their personally held Co-Diagnostics stock, they were officers and/or directors of the Company which gave them access, directly or indirectly, to material information about Co-Diagnostics not generally available to the public.

85.     Defendants Serbin and Durenard sold Co-Diagnostics stock at a time when they knew material information about Co-Diagnostics which would have significantly affected the market price of Co-Diagnostics common stock and was not generally available to the public. Specifically, Serbin and Durenard knew that Co-Diagnostics' test was not 100% accurate and made no effort to correct public statements to the contrary.

86.     Plaintiff, on behalf of Co-Diagnostics, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding against all of the Individual Defendants and in favor of Co-Diagnostics the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of statutory and common law fiduciary duties;

B.     Directing Co-Diagnostics to take all necessary actions to reform and improve its corporate governance and internal control practices and procedures to comply with applicable laws and best practices and to protect the Company and its shareholders from a recurrence of the damaging events described herein, including, but not limited to, amending Co-Diagnostics' By-

19

Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.      Awarding Co-Diagnostics restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct;

      D.      Awarding to Plaintiff his reasonable attorneys' fees, costs and disbursements in the action, including reasonable accountants' and experts' fees, costs, and expenses; and

      E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 25, 2021

**JONES WALDO HOLBROOK & MCDONOUGH, P.C.**

/s/ P. Matthew Muir

P. MATTHEW MUIR
170 S. Main St., Suite 1500
Salt Lake City, UT 84101-1644
Telephone: (801) 534-7483
Facsimile: (801) 328-0537
MMuir@joneswaldo.com

Verification follows

20

DocuSign Envelope ID: E35BADD6-D853-4FDF-8DC9-419BBA4A196A

## CO-DIAGNOSTICS, INC. VERIFICATION

I, Jason Reagan, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

1/19/2021

Date:_____

_____
Jason Reagan

Jason Reagan

**Index of Exhibits**

A.     Demand Letter

B.     Email